**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE ESTATE OF BRYAN CARRENO, et al., <br><br>            Plaintiffs, <br><br>     v. <br><br> COUNTY OF SANTA BARBARA, et al., <br><br>            Defendants. | CASE NO. 2:18-cv-3694-SK <br><br> **CORRECTED ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**I.**

**INTRODUCTION**

On the night of February 27, 2017, five Santa Barbara County Deputy Sheriffs shot and killed 26-year-old Bryan Carreno. Carreno's parents and his minor child then sued the deputy sheriffs under 42 U.S.C. § 1983 for federal civil rights violations under the Fourth and Fourteenth Amendments. They also alleged state law claims for battery, negligence, wrongful death, and violation of California's Bane Act. Defendants now seek summary judgment for the federal claims based on qualified immunity. They also seek summary judgment for the state law claims, arguing that their use of force was objectively reasonable. For the reasons below, Defendants are entitled to summary judgment on Plaintiffs' federal claims but not their state law claims.

## II.
## **BACKGROUND**

Nearly all material facts leading up to Carreno's fatal shooting are undisputed. Carreno was high on drugs and behaving erratically: he had climbed over neighbors' fences, run loose through their backyards, and jumped off one neighbor's roof. (ECF 43, Undisputed Material Fact ("UMF") 1; ECF 34-7 at 3-4). Carreno's father, "afraid [Carreno would] do something stupid," called 911 for help. (UMF 1; ECF 34-35, Ex. 24). He reported that his son was "hallucinating," "tripping out really, really bad," and "scar[ing] the heck out of [neighbors]." (*Id.*). He also later told police that Carreno owned a small hatchet, although no one had seen him with it or knew if he had taken it with him. (UMF 8; ECF 34-9 at 6). Soon after they started searching for Carreno, police found a large kitchen knife stuck in the ground by a neighbor's fence that Carreno had climbed over. (UMF 6; ECF 34-9 at 5-6). That discovery prompted a night-time, neighborhood search involving several police on foot, a K-9 unit, and a roving police helicopter. (UMF 7; ECF 34-4 at 2-3; ECF 34-5 at 3; ECF 34-9 at 5-6).

Police searched for Carreno for almost two hours, during which he neither identified nor revealed himself to police announcements or instructions. (UMF 10, 16; ECF 34-9 at 2, 6). So police had to create a perimeter around a large search zone, instruct residents to shelter in place, and perform selective house-to-house searches in the dark. (UMF 7, 11; ECF 34-4 at 3; ECF 34-9 at 6-7). All the officers were armed, but at least one had a less lethal shotgun and the lead officer had his K-9 dog, a taser, and a baton. (UMF 17, 19; Disputed Material Fact ("DMF") 41; ECF 34-9 at 2). When police finally found Carreno, he had entered a neighbor's home without permission and taken a large kitchen knife. (UMF 15, 38; ECF 34-4 at 5; ECF 34-5 at 5; ECF 34-9 at 7-9). From the backyard of that house,

police spotted Carreno inside. (ECF 34-4 at 6; ECF 34-5 at 6). What happened in the next 18 seconds was recorded by the lead officer's belt camera in real time. (ECF 34-26, Ex. 15; *see* UMF 33).

That recording, construed in the light most favorable to Plaintiffs, reveals the following sequence of events: one of the deputies announces, "I've got movement" and "there he is," as other deputies yell "don't move" and "let me see your hands." (ECF 34-26, Ex. 15, Sequence A, V1). Almost simultaneously, another deputy yells "he's got a knife" three times rapidly. (*Id.*). All five deputy sheriffs then surround the backyard door in a rough L-formation. (ECF 34-15, Ex. 4). They order Carreno to drop the knife. (ECF 34-26, Ex. 15, Sequence A, V1). Carreno, with the knife still in his hand, can be heard shouting "shoot me." (*Id.*). Carreno then walks through the door, approaching the police outside with the knife still in his right hand but down by his side. (*Id.*). A deputy says to his fellow officers, "Hold up. Slow it down. Slow it down." (*Id.*; *see* ECF 34-4 at 6). Carreno continues to walk toward police, but he does not run or charge at them. (ECF 34-26, Ex. 15, Sequence A, V1; UMF 27, 30; DMF 42). Within three seconds of Carreno stepping outside (UMF 33, 34), the five surrounding deputy sheriffs open fire, hitting Carreno with 20 rounds (ECF 34-26, Ex. 15, Sequence A, V1; ECF 41 at 9).

The deputy sheriffs later described Carreno as exhibiting a glassy or blank stare, appearing to look through them as if they were not there. (ECF 34-4 at 7; ECF 34-5 at 7; ECF 34-7 at 6). They also testified that during their encounter with Carreno they had feared he might strike one of them with his drawn knife. (*Id.*). The officer nearest to Carreno was at least ten feet or more away. (ECF 41 at 10, 16).

3

## III.
## DISCUSSION

Qualified immunity shields public officials sued for monetary damages unless their conduct violates "clearly established" law that any reasonable officer would have known. *Saucier v. Katz*, 533 U.S. 194, 199 (2001). The doctrine's purpose is to balance two important yet competing interests: "the need to hold public officials accountable for irresponsible actions, and the need to shield them from liability when they make reasonable mistakes." *Morales v. Fry*, 873 F.3d 817, 822 (9th Cir. 2017). To that end, it "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To determine whether Defendants are entitled to qualified immunity, the Court must decide: "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) (internal quotation marks and citation omitted). If the answer to either question is no, Defendants are entitled to qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

### A. Material Disputes Exist for Plaintiffs' Fourth Amendment Claim But Not Their Fourteenth Amendment Claim

In Fourth Amendment excessive force cases, the central issue is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989); *see Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). This fact-

specific inquiry weighs the intrusion on an individual's rights against the countervailing government interests at stake "without regard for the officers' underlying intent or motivations." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019).  Factors relevant to the excessive-force inquiry include: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape." *George v. Morris*, 736 F.3d 829, 837 (9th Cir. 2013) (internal quotation marks and citation omitted).  Other relevant factors are "the availability of less intrusive alternatives to the force employed, whether proper warnings were given[,] and whether it should have been apparent to officers" that the suspect was emotionally disturbed.  *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011).

Generally, the "most important" consideration is whether a suspect posed an immediate threat of serious physical injury to anyone's safety.  *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031-32 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2613 (2019).  But that factor must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.  And the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Even so, qualified immunity under the first prong should be granted "sparingly" at the summary judgment stage when, as here, "the only witness other than the officers was killed during the encounter." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc).  That caution applies even if, as here, there is video of the fatal shooting.  *See Scott v. Harris*, 550

U.S. 372, 380 (2007). Unless a plaintiff's account is "so utterly discredited" or "blatantly contradicted" by the video evidence, *id.* at 378-80, the "mere existence of video footage . . . does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage." *Vos*, 892 F.3d at 1028. That is the situation here: reasonable jurors could draw divergent conclusions from what the video shows. *See Glenn*, 673 F.3d at 878 ("The circumstances of this case can be viewed in various ways, and a jury should have the opportunity to assess the reasonableness of the force used after hearing all the evidence."); *S.R. Nehad*, 929 F.3d at 1132-39 (many fact issues precluded summary judgment on § 1983 excessive force claim with surveillance footage). So with all reasonable inferences drawn in Plaintiffs' favor, there remains a genuine factual dispute about whether Carreno posed a serious threat to Defendants' safety under the totality of the circumstances.

      For starters, the video reveals that Carreno was walking out of the house without charging at police or appearing to focus on a specific target. *See S.R. Nehad*, 929 F.3d at 1134 (excessive force held triable issue where suspect made no "sudden movements" or "move[d] the supposed knife," was "seventeen feet away" from police, was "walking" at "'relatively slow pace,'" and was given no warning of lethal force). The video also shows that while armed with a knife, Carreno did not raise or brandish it. *See Hayes v. County of San Diego*, 736 F.3d 1223, 1230, 1234 (9th Cir. 2013) (excessive force held triable issue where victim shot "walking towards the deputies" with knife pointed down but "not charging," six to eight feet away from nearest officer, and had "'clueless'" expression). Moreover, a jury could conclude from the video that police were beyond striking range since the nearest officer was no closer than ten feet. *See S.B.*, 864 F.3d at 1014 (excessive force held triable issue because "when [suspect] grabbed the knife,

6

[he] was approximately six to eight feet away").

In addition, while Defendants ordered Carreno to drop the knife, they issued no explicit warnings that they would fire on him, which they did within three seconds of him stepping outside. *See Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1007 (9th Cir. 2017) (police-shooting victim "could have been processing [officer's] order [to drop gun] in the three seconds before he was shot"), *cert. denied*, 138 S. Ct. 2680 (2018); *Hayes*, 736 F.3d at 1228, 1234 (excessive force held triable issue when police fired four seconds after seeing unexpected knife in suspect's hand even though suspect continued to walk to police and "'wasn't stopping'"). Nor did they appear to consider less lethal alternatives, even though at least one officer had a less lethal shotgun and the lead officer had his K-9 dog, a taser, and a baton. *See Zion v. County of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) ("[T]erminating a threat doesn't necessarily mean terminating the suspect. . . . This is particularly true when the suspect wields a knife rather than a firearm."), *cert. denied*, 138 S. Ct. 1548 (2018); *Vos*, 892 F.3d at 1033-34 (triable issue whether police used excessive force when they fired "'within eight seconds'" of suspect charging but had enough time to "create a perimeter, assemble less-lethal means, coordinate a plan for their use of force, establish cover, and, arguably, try to communicate with Vos").

Add to these facts Carreno's suspected mental instability (caused by drugs or otherwise)—a fact that must be construed in Plaintiffs' favor at this stage—and rational jurors could permissibly conclude that Carreno posed no significant immediate danger to anyone when Defendants shot him. *See Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010) ("greater effort to take control of the situation through less intrusive means" may be necessary for mentally ill or unstable suspects); *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) ("Even when an emotionally disturbed individual is

'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual.").

Plaintiffs' Fourteenth Amendment claim, however, is a different matter. To prevail on a substantive due process claim for loss of familial relations, police action must essentially shock the conscience. *See A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013). Although objectively unreasonable use of force could rise to meet the shock the conscience standard, it is not alone enough. *See Brittain v. Hansen*, 451 F.3d 982, 991 n.1 (9th Cir. 2006). Plaintiffs must also show that police deployed force with "a purpose to harm . . . without regard to legitimate law enforcement objectives." *Porter v. Osborn*, 546 F.3d 1131, 1133 (9th Cir. 2008). Whatever else can be said about the deputy sheriffs' use of force here for Fourth Amendment purposes, there is no evidence that they had an ulterior motive to harm when they fired on Carreno. "Whether excessive or not, the shootings served the legitimate purpose of stopping" someone they believed was "a dangerous suspect." *Zion*, 874 F.3d at 1077. No reasonable jury could conclude from the undisputed material facts or from watching the video that Defendants acted without a legitimate law enforcement purpose in violation of substantive due process standards, even if it were to conclude that their use of lethal force was objectively excessive by Fourth Amendment standards. *See S.R. Nehad*, 929 F.3d at 1139-40.

### B. It Was Not Clearly Established in February 2017 That Shooting Carreno Was Unlawful Under the Circumstances

Despite factual issues precluding summary judgment on whether Defendants violated the Fourth Amendment when they shot Carreno, that is

not the end of the qualified immunity inquiry. *See Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 945 (9th Cir. 2017). To overcome Defendants' assertion of qualified immunity, Plaintiffs must prove that it was clearly established on the night in question that the use of lethal force was unconstitutional—under the specific, material circumstances Defendants faced when confronting Carreno. *See United States v. Lanier*, 520 U.S. 259, 271 (1997); *Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019); *Sharp v. County of Orange*, 871 F.3d 901, 912 (9th Cir. 2017). The "'clearly established' prong of the qualified immunity analysis . . . is a question of law that must ultimately be decided by a judge." *Morales*, 873 F.3d at 819.

"Clearly established means that . . . the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks and citations omitted). "Because the focus is on whether the officer had fair notice that [the] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (per curiam). And the law must be settled by then-existing precedent, "which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Wesby*, 138 S. Ct. at 589-90. There need not be a case directly on point, "but existing precedent must have placed the . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. To meet that exacting standard, the contours of a constitutional right may "not be defined 'at a high level of generality'" but must be "'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). That specificity is "especially important" in excessive force cases in which it "'is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will

9

apply to the factual situation the officer confronts.'" *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015) (per curiam) (citation omitted).

Here, by the time they came face to face with Carreno, Defendants confronted a suspect who they knew: (1) had been behaving unpredictably under the influence of drugs; (2) had eluded police for two hours peregrinating at night through backyards of a residential neighborhood; (3) had broken into a stranger's home where he grabbed a kitchen knife; (4) was emerging from the house still holding the drawn knife at his side; and then (5) said "shoot me" as he moved towards the surrounding officers who were ten feet or more away. Plaintiffs have identified no binding or even forcefully persuasive cases—nor has the Court found any—that would have unmistakably instructed police as of February 2017 not to fire on Carreno under this unique combination of facts.

For Supreme Court cases, Plaintiffs point to *Graham*, *Garner*, and *Brosseau*. But those cases do not settle the "'constitutional question beyond debate.'" *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (citation omitted). None of them even resembles this case on the material facts. *See Graham*, 490 U.S. at 388-90 (police used physical force on diabetic plaintiff and withheld sugar while he suffered an insulin reaction); *Garner*, 471 U.S. at 3-4 (unarmed suspect shot while fleeing from burglary of unoccupied house); *Brosseau*, 543 U.S. at 196-97 (fleeing suspect shot in the back). At best, they describe general excessive force principles, but they do not create clearly established law "outside 'an obvious case.'" *White*, 137 S. Ct. at 552 (quoting *Brosseau*, 543 U.S. at 199). Not even Plaintiffs argue, though, that Defendants' conduct was flagrant enough to be unconstitutional by this "obviousness principle" alone. *Sharp*, 871 F.3d at 912.

Plaintiffs have not located the requisite clearly established law in binding Ninth Circuit cases, either. For starters, *Harris v. Roderick,* 126

F.3d 1189 (9th Cir. 1997), bears no resemblance to this case. It involved an FBI sniper, positioned safely on a hilltop, who shot a man in the back while he was retreating during the Ruby Ridge standoff. *See id*. at 1204. *George*, 736 F.3d at 837-38, is inapt as well. There, police "shot [a] sixty-four-year-old decedent without objective provocation while he used his walker, with his gun trained on the ground." *Id.* at 839. Likewise, the victim in *Deorle*, 272 F.3d at 1275, is not "analogous because that emotionally disturbed individual was unarmed at the time an officer shot him in the face with a beanbag gun." *S.B.*, 864 F.3d at 1016 n.5. Nor does *Glenn* apply. The suspect there was "suicidal," holding a "pocketknife with a three-inch blade . . . to his own neck," and standing "outside his home talking with his parents and friends." 673 F.3d at 873. He "stayed in the same position from the moment officers arrived and showed no signs of attempting to move until after he was fired upon." *Id.* at 874. Carreno, by contrast, was not reported to 911 as suicidal, was outside a stranger's home he had apparently broken into, and made movements toward police while saying "shoot me."

Plaintiffs' reliance on *Hughes v. Kisela*, 862 F.3d 775 (9th Cir. 2016), is also unavailing. They argue that, even though the Supreme Court reversed *Hughes* two years later, *see Kisela*, 138 S. Ct. at 1148, the deputies here still should have known about *Hughes*—while it was briefly good law—and read it to prohibit lethal force.[1] But the shooting victim in *Hughes* appeared "composed and content," and was at home on her own driveway holding a

---

[1] It is doubtful that *Hughes* can be a source of clearly established law at any time. *See Reese v. County of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (relying on Supreme Court's 2018 reversal of *Hughes* to "confirm[] that the law was not clearly established" for shooting in 2011); *Estate of Garcia Toribio v. City of Santa Rosa*, 381 F. Supp. 3d 1179, 1189-90 (N.D. Cal. 2019) (applying analysis of 2018 *Kisela* decision from Supreme Court to lethal shooting that happened in August 2017); *Cortesluna v. Leon*, 2018 WL 6727824, at *11 (N.D. Cal. Dec. 21, 2018) (same for non-lethal shooting in November 2016).

kitchen knife. *Hughes*, 862 F.3d at 778. She had not been roaming in neighbor's backyards, eluding police at night for two hours, or emerging from someone else's home. And while a kitchen knife "has a perfectly benign primary use" when a suspect is seen with it on her own property, it is hardly "benign" when a suspect grabs it at nighttime from another's home that he has no right to be in. *Id.* at 784-85. As a result, an officer could reasonably miss the connection between the facts of *Hughes* and the situation Defendants confronted here.

On the other hand, Defendants could have reasonably drawn a closer comparison between this case and the facts of *Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005). In that case, police responded to a report that a man was walking through a residential neighborhood carrying a sword and acting "erratically." *Id.* at 1112. There, as here, the police shot the man after he refused their commands to drop his weapon. *Id.* at 1113. There, as here, the man might not have heard the commands. *Id.* at 1112 n.2. And there, as here, the police believed (perhaps mistakenly) that the man posed an immediate threat to others because he was roaming through a residential neighborhood. *Id.* at 1112. Even so, the Ninth Circuit in *Blanford* held that the use of deadly force in that case did not violate the Fourth Amendment. *Id.* at 1119. To be sure, there are material differences between *Blanford* and this case: the victim in *Blanford* "raised" his sword, *id.* at 1113, and the bladed weapon he carried was larger and longer than a kitchen knife. But the material similarities are enough to make the lawfulness of Defendants' use of lethal force here at least debatable even under Ninth Circuit cases decided by February 2017.

More recent Ninth Circuit decisions only reinforce that conclusion. In *Reese*, for instance, the Ninth Circuit held that as of March 2011—the same year that *Glenn* came out—the Fourth Amendment did not clearly prohibit

12

the use of deadly force against a suspect who, like Carreno, was under the influence of drugs and holding—but not brandishing—a drawn knife. *See* 888 F.3d at 1035-40. Similarly, in *S.B.*, the Ninth Circuit held that as of August 2013—the same year that *George* was decided—it was not clearly established that the use of deadly force was unconstitutional against a "mentally ill and intoxicated individual" with a knife in his possession. 864 F.3d at 1014. It made no legal difference that, as here, police there failed to warn the victim "that he was about to be shot" and had "a non-lethal option" available. *Id.* Nor did it matter that the victim in *S.B.*, in stark contrast to Carreno, had visibly "complied with the officers' orders" and "was on his knees when he was shot." *Id.* Finally, in *Vos*, the Ninth Circuit found no clearly established right against lethal force as of May 2014 when officers confronted and shot an erratic suspect under the influence of drugs, who was yelling "'shoot me'" while holding a pair of scissors. 892 F.3d at 1028-29, 1035-36. Like Carreno, the suspect endangered no bystanders, had no clear line of escape, and was outnumbered (eight to one) by surrounding police officers with non-lethal options. *Id.* at 1032-33. Yet if the suspects in *Reese, S.B.*, and *Vos* had no clearly established right to be free of lethal force in those cases with those facts, it is nearly impossible to see how Carreno could have had such a clearly established right (just three years later) under quite similar circumstances.

   Plaintiffs' fallback is a mix of published and unpublished opinions from outside the Ninth Circuit and one district court case. But without "any cases of controlling authority," the irreducible minimum for clearly established law must be a robust "consensus of cases of persuasive authority." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). Plaintiffs' selected assortment of cases do not coalesce into such a persuasive body of law. *See West*, 931 F.3d at 986 ("[A]n isolated [out-of-circuit] case . . . cannot provide

clearly established law in our circuit."); *Hamby v. Hammond*, 821 F.3d 1085, 1095 (9th Cir. 2016) ("district court decisions . . . do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity" (internal quotation marks and citation omitted)). At most, they "could lead reasonable persons to different conclusions," but they do not "pronounce[] a constitutional rule at a level of specificity sufficient to alert these deputies here that their conduct was unconstitutional in the specific circumstances they confronted." *Sharp*, 871 F.3d at 916.

For instance, the victim in *Connor v. Thompson*, 647 Fed. App'x 231 (4th Cir. 2016) (per curiam) was an "obviously impaired but non-aggressive" person who was "suicidal and needed help," could "barely walk," "had difficulty standing," and held "a knife in his own residence." *Id.* at 237-39. Likewise, the Sixth Circuit's cases in *Studdard v. Shelby County*, 934 F.3d 478 (6th Cir. 2019), and *Sova v. City of Mt. Pleasant*, 142 F.3d 898 (6th Cir. 1998), dealt with suicidal victims who posed no danger to anyone other than themselves. *See Studdard*, 934 F.3d at 482 ("Both cases involved men with knives who had cut themselves—and threatened worse to themselves.").[2] And *Reed v. City of Modesto*, 122 F. Supp. 3d 967 (E.D. Cal. 2015), also involved a suicidal plaintiff holding a knife in his own home when shot. *Id.* at 971, 979-80. Even the circuit opinions cited in *Reed* involved victims

---

[2] Furthermore, there is no "consensus" even within the Sixth Circuit on the reach of *Studdard* and *Sova*. *See Reich v. City of Elizabethtown,* 945 F.3d 968, 982 (6th Cir. 2019). In *Reich*, a mentally unstable victim was wielding a knife, ignoring police commands to drop the knife, and advancing toward police while inviting suicide by cop. *Id.* Even though that suspect had raised his knife in a "stabbing position," he was still "twenty-five feet away from one officer and thirty-six feet away from another." *Id.* But as the Sixth Circuit explained, "[r]eading *Sova* and *Studdard* would not impress upon every reasonable officer the clear understanding" that shooting the victim there from a distance of 25 to 36 feet would violate any clearly established right as of 2015. *Id.* at 981. So these cases do not settle the excessive force question here beyond debate. *See Wilson*, 526 U.S. at 618 ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.").

who—unlike Carreno—made no movement towards police and were shot in or outside their own homes.  *See Walker v. City of Orem*, 451 F.3d 1139, 1159 (10th Cir. 2006) (no advancement towards police officers); *Reyes v. Bridgwater*, 362 Fed. App'x 403, 405, 407 (5th Cir. 2010) (victim stood "in his own home, with a kitchen knife at []his side" and did not step towards police officers); *Zulock v. Shures*, 441 Fed. App'x 294, 302 (6th Cir. 2010) (victim "was standing in his own kitchen, holding a cooking knife" and had begun "walking *away*" from the officer when he was shot).  So if these cases clearly establish anything, it is nothing that helps Plaintiffs here.

## IV.
## CONCLUSION

For all these reasons, summary judgment will be entered in Defendants' favor on Plaintiffs' federal claims.  They are entitled to summary judgment on the Fourth Amendment claim under the second prong of qualified immunity analysis and on the Fourteenth Amendment claim under the first prong.  Plaintiffs' state law claims, however, survive summary judgment because there remains a genuine dispute of material fact about whether Defendants' use of lethal force was objectively reasonable.  *See Hayes*, 736 F.3d at 1232 ("Claims of excessive force under California law are analyzed under the same standard of objective reasonableness used in Fourth Amendment claims."); *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1171 (9th Cir. 2013) ("[T]he doctrine of qualified immunity does not shield defendants from state law claims.").

**IT IS SO ORDERED.**

DATED: January 25, 2020

STEVE KIM
U.S. MAGISTRATE JUDGE

15